UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re<br><br>**RICKY R. HOWARD and**<br>**ANGELA P. HOWARD,**<br><br>                    **Debtors**<br><br>**JUANITA EVANS,**<br><br>                    **Plaintiff**<br>            v.<br><br>**RICKY R. HOWARD and**<br>**ANGELA P. HOWARD,**<br><br>                    **Defendants** | **Chapter 7**<br>**Case No. 10-19791**<br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 10-1346** |

**MEMORANDUM OF DECISION**

**I. Overview**

By her complaint in this adversary proceeding, plaintiff Juanita Evans ("Evans") seeks a determination that her claim against the defendant-debtors, Ricky R. Howard ("Ricky") and Angela P. Howard ("Angela") (collectively, the "Debtors") is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as a debt arising from a false representation. The claim arises from the sale of a townhouse condominium located at 95 Claybourne Street, Unit 95, Dorchester, Massachusetts (the "Property") by the Debtors to Evans that was admittedly intended to be a temporary transfer of the Property to Evans while the Debtors "fixed" their credit rating. Evans financed the purchase with a new loan on which she alone was liable and, when the Debtors failed to repay that loan, Evans was forced to conduct a short sale that resulted in her assuming a $60,000 debt to the mortgagee that she still owes. After a trial, the

1

Court now makes the following findings and rulings and, on the basis thereof, concludes that Evans has not established cause to except her claim from discharge under Chapter 7 of the Bankruptcy Code.

**II. Findings of Fact and Procedural History**

On June 9, 2005, the Debtors purchased the Property for $316,500, subject to first and second mortgages totaling $317,500. Less than a year later, Evans moved into the Property with the Debtors. At the time, Evans had been working at NSTAR for sixteen years and, although she did not make rent or mortgage payments to the Debtors, she contributed to the household expenses by paying the electric bill.  In July of 2006, Angela's father died and the Debtors alone shouldered the burden of the funeral expenses. Soon thereafter, the Debtors fell behind on their mortgage and automobile loan payments. In the fall of 2006, the Debtors' truck was repossessed—an event of which Evans was aware.

After the repossession, Angela and Evans had a conversation that laid the foundation for the present dispute. Although the parties disagree about who initiated the conversation, it is clear that during it Evans became fully cognizant of the Debtors' inability to pay their mortgage.  As a result, Evans referred the Debtors to an acquaintance, Dr. Lynn, whom Evans suggested could help the Debtors refinance their mortgage loan. The Debtors met with Dr. Lynn and were then directed to a person named Jason, who informed the Debtors that their poor credit rating disqualified them from refinancing. The solution, according to Jason, was for the Debtors to refinance by essentially borrowing Evans's credit by selling Evans the Property with the understanding that the Debtors would repurchase the Property once their credit improved.[1] Evans agreed to participate in the transaction and soon thereafter obtained financing for the entire purchase price of $350,000 by misrepresenting her income on the loan documents.  On October 26, 2006, Evans purchased the Property from the Debtors. Evans alone was

---

[1] The parties also disagree about whether there was a temporal element to the repurchase agreement. Evans claims that the Debtors were to repurchase in a year's time once the Debtors' credit had improved. The Debtors contend there was no temporal restriction.  Both parties do agree, however, that the repurchase was contingent on an improvement in the Debtors' credit.

2

liable on the note and accompanying mortgage, but as agreed, the Debtors continued to make the payments.

Before long, however, the Debtors once again ran into financial difficulties. In January of 2007, Ricky lost his job and did not find employment for three years. Although he did receive unemployment compensation, it was significantly less than he made while working. The Debtors' income was further diminished when Angela's mother died in September of 2007, after which Angela reduced her work hours to care for a niece that had been in Angela's mother's custody. Although the Debtors managed to make thirteen monthly payments, totaling $37,940, they eventually fell into arrears and stopped paying after February of 2008.

As the Debtors' financial circumstances deteriorated, so did their relationship with Evans, who continued to live with the Debtors without making rent or mortgage payments until moving out in late 2007 or early 2008. In March of 2008, Evans and Angela exchanged a series of highly charged emails memorializing the bad blood that had developed between them. During this exchange, Evans demanded that the Debtors take back the Property, while Angela declared that the Debtors were moving out and would "no longer pay [Evans's] mortgage and condo fees."[2] Most important, at least according to Evans, was Angela's statement that "I knew we couldn't pay this mortgage but didn't want you to think I was getting back at you because of everything I stated above."[3] Soon thereafter, the Debtors vacated the Property and made no further mortgage payments. In order to avoid foreclosure, Evans sold the Property in a short sale for $225,000. Because the bank determined that Evans had acted fraudulently in procuring her loan, Evans was required to execute a promissory note for $60,000 to repay part of the shortfall. Evans then filed a complaint against the Debtors in state court for damages arising from the sale of the Property. The precise nature of the state law claims is unclear from the evidence.

---

[2] *Email from Angela Howard to Juanita Evans*, Mar. 10, 2008, Plaintiff's Exhibit 104.
[3] *Id.*

On September 8, 2010, the Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code, commencing the present bankruptcy case. Upon the filing of the Debtors' bankruptcy petition, the state court action, which was then still pending, was automatically stayed. In due course, the Debtors received a discharge under Chapter 7 of the Bankruptcy Code. Evans timely filed the complaint commencing this adversary proceeding. The complaint seeks a determination that her prepetition claims against the Debtors are excepted from discharge under 11 U.S.C. § 523(a)(2)(A).[4] The complaint, which is not a model of clarity, states generally that the Debtors misrepresented to Evans that the transfer to Evans of the Property and the concomitant debt that she incurred would be temporary and that the Debtors did not truly intend to accomplish the retransfer. A one-day trial was held, following which I took the matter under advisement.

### III. Discussion

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). Evans argues that the Debtors falsely represented to her that the transfer of the Property would be temporary when in fact the Debtors never intended to repurchase the Property. Evans asserts that this misrepresentation resulted in a $60,000 debt to the bank that should rightly be borne by the Debtors.

A party seeking a determination of nondischargeability bears the burden of establishing by a preponderance of the evidence that a particular debt falls within § 523(a)(2)(A) and therefore should be excepted from discharge. *Grogan v. Garner*, 498 U.S. 279, 291 (1995). If the plaintiff fails to establish any one of the necessary elements of § 523(a)(2)(A), then the court should reject the plaintiff's claims.

---

[4] Although the complaint alleged nondischargeability under 11 USC § 523(a)(2)(B), at trial the parties agreed that this was a typographical error and that the intent was to proceed under 11 USC § 523(a)(2)(A). As § 523(a)(2)(B) is plainly inapplicable to the present issue, and the Debtors have not suggested any prejudice arising from the error, I accept the parties' stipulation and will review the Plaintiff's claim under § 523(a)(2)(A).

4

*Palmacci v. Umpierrez*, 121 F.3d 781, 787-88 (1st Cir. 1997). To establish that a debt is nondischargeable under § 523(a)(2)(A) due to a false representation, the plaintiff must prove each of the following elements:

> (1) the debtor made a false representation either knowingly or with reckless disregard for the truth;
> (2) the debtor intended to deceive;
> (3) the debtor intended to induce the creditor to rely upon the false statement;
> (4) the creditor actually relied upon the misrepresentation;
> (5) the creditor's reliance was justifiable; and
> (6) the reliance upon the false statement caused damage (pecuniary loss).

*McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001); *Palmacci*, 121 F.3d at 786. Mere negligence is insufficient to prove actual fraud. *Palmacci*, 121 F.3d at 788. Intent can rarely be proven by direct evidence; therefore, in attempting to discern it, the court should consider the totality of the circumstances. *Id*. at 790. I now turn to the alleged false representation.

The first requirement for establishing nondischargeability is proof of a knowing misrepresentation, or of one made in reckless disregard for the truth. The "concept of misrepresentation includes a false representation as to one's intention, such as a promise to act." *Id.* at 786. Here, Evans contends that the Debtors falsely represented their intent to repurchase the property from her once their credit improved. If Evans is correct, such a promise would clearly fall within the scope of § 523(a)(2)(A).

Evans's strongest evidence of a knowing misrepresentation was Angela's email, which stated: "I knew we couldn't pay this mortgage but didn't want you to think I was getting back at you because of everything I stated above."[5] Evans portrays this as conclusive evidence that the Debtors never intended to repurchase the Property. Conversely, at trial Angela testified that this statement was taken out of context and that, at the time of the agreement, she did believe she could pay the mortgage.[6] I find Angela's testimony more credible and her interpretation more persuasive: Angela's statement must be

---

[5] *Email from Angela Howard to Juanita Evans*, Mar. 10, 2008, Plaintiff's Exhibit 104.
[6] Tr. May 2, 2012, pp. 50-51, 63-64.

5

read in the context in which it was made—especially considering that the statement itself makes an explicit reference to "everything [she] stated above."[7]

"Above," Angela recounted the course of events that unfolded before and after the conveyance. First, she described the parties' relationship prior to the conveyance, specifically, the Debtors taking Evans into their home; their frequent intimate conversations; Angela's appreciation when Evans gave her money to keep her car in good standing; and how Evans tried to help the Debtors by referring them to Dr. Lynn for refinancing. Angela then expressed her frustration with Evans over a number of issues that largely occurred after the conveyance: for failing to contribute rent throughout 2006 and 2007; for not leaving a tip for Angela at the hair salon despite knowing that Ricky lost his job; for not attending Angela's mother's funeral; for retaining income tax refunds acquired by claiming deductions for mortgage interest and property tax payments made by the Debtors; and finally, for making the Debtors feel like renters after the conveyance.[8]

Properly contextualized, it is difficult to conceive how Angela's statement that the Debtors knew they couldn't pay the mortgage could be rationally construed as evidence of her state of mind at the time she entered into the agreement. First, the evidence suggests that at the time of the agreement, the parties' relationship was mostly harmonious. Second, Evans's assertion is belied by the fact that the Debtors did pay the mortgage and only fell into arrears after Ricky lost his job. The more reasonable interpretation of the statement is that Angela had not previously told Evans that Ricky's job loss rendered them unable to afford the mortgage, because she was worried that Evans would perceive it as retribution for the discord that developed subsequent to the conveyance. Similarly, Angela's ensuing email statement that the Debtors would no longer pay *Evans's* mortgage and condo fees was clearly a reference to her claim that Evans treated the Debtors like renters after the conveyance, rather than to the Debtors' state of mind prior to the conveyance. Consequently, I find that Evans has not proven by a

---

[7] *Email from Angela Howard to Juanita Evans*, Mar. 10, 2008, Plaintiff's Exhibit 104.
[8] *Id.*

6

preponderance of the evidence that the Debtors falsely represented their intent to repurchase the Property.

The second element of nondischargeability under § 523(a)(2)(A) "refers to a different type of intent, namely intent to deceive, manipulate, or defraud." *Palmacci*, 121 F.3d at 787. Intent to deceive is established where the person making the representation "(a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows that he does not have the basis for his representation that he states or implies." *Id.* (quoting *Restatement (Second) of Torts* § 526 (1977)). "Subsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made." *In re Aoki*, 323 B.R. 803, 815 (1st Cir. B.A.P. 2005) (quoting *Williamson v. Busconi*, 87 F.3d 602, 603 (1st Cir. 1996).

For this element, Evans points to the Debtors' refusal to repurchase the property despite Evans's repeated requests to do so.[9] Although I do find that the Debtors' subsequent conduct reflected their state of mind at the time of the agreement, that finding will provide only cold comfort for Evans. The fact that the Debtors never repurchased the property is not dispositive as to their intent, because no evidence was proffered suggesting that the Debtors' credit ever actually improved. In fact, the evidence tended to show that, through no fault of their own, the Debtors' ability to repurchase the Property degraded after the parties entered into the agreement. What I do find germane to this issue is that despite their financial difficulties, the Debtors continued to pay the mortgage for more than a year. This subsequent conduct suggests that the Debtors had every intention of complying with the terms of

---

[9] Evans also testified—and the Debtors denied—that the Debtors orally agreed to share the proceeds remaining from the sale to Evans. The sale did produce proceeds for the Debtors in the amount of $15,086, the Debtors' retention of which Evans characterized as evidence of their intent to deceive. The parties' lengthy dispute as to how the money was spent notwithstanding, I find that Evans failed to establish the existence of this oral promise. Consequently, the Debtors' failure to share the proceeds flowing from the sale does not constitute evidence of intentional deception.

the agreement. Accordingly, I find that Evans has failed to sustain her burden as to the intentional deception element.

Because I find that Evans has failed to prove, by a preponderance of the evidence, (i) that the Debtors knowingly or recklessly misrepresented their intent and (ii) that the Debtors had the requisite intent to deceive, a discussion of the remaining elements is not required. *See Palmacci*, 121 F.3d at 788 (1st Cir. 1997).

**IV. Conclusion**

For the reasons set forth above, the Court finds that Evans has failed to meet her burden for establishing cause for exception to discharge under § 523(a)(2)(A). By separate order, the Court will dismiss her complaint with prejudice.

Date: November 1, 2012      _____
                            Frank J. Bailey
                            United States Bankruptcy Judge